## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

UNITED STATES of AMERICA,

        *Plaintiff,*

v.

        Case No. 15-40031-DDC

ALEXANDER E. BLAIR,

        *Defendant.*

### SENTENCING MEMORANDUM

On August 24, 2016, the Court will sentence Alex Blair for a violation of 18 U.S.C. § 371 and §2, specifically a conspiracy to commit an offense against the United States in violation of 18 U.S.C. 844(f)(1). The defense respectfully requests that the Court consider the limited factual basis for Mr. Blair's guilty plea and his highly unique personal circumstances and vary from the guidelines' imprisonment sentence to impose a sentence of five years of probation.

The defense offers the following argument and authorities in support of this sentencing request.

### ARGUMENT AND AUTHORITIES

The Sentencing Reform Act, as modified by *Booker*, requires the Court "to take account of the sentencing guidelines together with other sentencing goals" when sentencing a defendant. *United States v. Booker*, 543 U.S. 220, 259 (2005). Although the

"Guidelines should be the starting point and the initial benchmark," district courts may impose sentences within statutory limits based on appropriate consideration of all of the factors listed in § 3553(a), subject to appellate review for "reasonableness." *Gall v. United States*, 552 U.S. 38, 49 (2007).  A district court "may not presume that the Guidelines range is reasonable," but must "make an individualized assessment based on the facts presented." *Id.* at 50.

The § 3553(a) factors support a non-prison sentence in this case.

**I.      Alex's offense must be considered in light of his extremely unique history and characteristics.**

On May 23, 2016, Alexander Blair pleaded guilty to the Information (Doc. 18) charging him with a violation of 18 U.S.C. § 371 and § 2, specifically a conspiracy to commit an offense against the United States in violation of 18 U.S.C. 844(f)(1). Underlying Alex's conviction was a $100 loan he made to John T. Booker, Jr. for the purpose of renting a storage unit. Alex made the loan knowing that Booker wanted to commit an act of jihad with the help of his "handler," knowing that the loan would help Booker follow through with instructions from his "handler," and believing that the storage unit was part of plans for a suicide bombing. Alex also knew that Booker intended to direct his jihad at the United States military.

That is the simplest way of stating Alex's crime, and it suffices to establish guilt. But formulating an appropriate sentence for Alex requires more than consideration of guilt at

this most basic level. Alex's culpability, and the sentence that fits it, can only be properly evaluated in the context of Alex's extremely unique history and characteristics.

Alex was born with Williams syndrome, a genetic condition caused by micro-deletion of 16 genes on chromosome 7q11.23. Along with several physical health problems, Williams syndrome causes developmental delays and produces a characteristic personality profile. Overall, the effects of Alex's unique biological constitution made him particularly vulnerable and naive in his interactions with Booker. The Diagnostic Interview Report prepared by forensic psychiatrist Stephen E. Peterson, M.D. after evaluating Alex based on testing, a personal interview, family interviews, and a review of Alex's educational and medical records, and reviewing relevant discovery (Exhibit 1), and scientific articles on Williams syndrome help explain why Alex's guilt does not warrant the penalty suggested by the Sentencing Guidelines.

While Alex "demonstrates near normal intelligence, . . . he experienced abnormal-brain-development mediated communication and interpersonal difficulties. " Exhibit 1, Dr. Peterson's Report, p. 18. As a result of his Williams syndrome, Alex demonstrates reasoning patterns that are not in keeping with his biological age. Exhibit 1, Dr. Peterson's Report, pp. 12, 15. His thinking is simplistic and concrete, not lending itself to the abstract reasoning that would be expected of a typical adult in his late twenties. Exhibit 1, Dr. Peterson's Report, pp. 12, 15. He also exhibits the characteristic Williams

3

syndrome personality, which includes a high sociability and compulsion to connect with

others, combined with an unfortunate competing inability to process nuanced social cues.

Exhibit 1, Dr. Peterson's Report, p. 15; *see also* David Dobbs, *The Gregarious Brain*, N.Y.

Times Mag., July 8, 2007, http://www.nytimes.com/2007/07/08/magazine/08sociability-t.

html?_r=0, attached as Exhibit 2. Thus, while those affected by Williams syndrome are

characteristically extremely friendly, they often have trouble sustaining friendships,

especially with peers. Exhibit 3, Jarniven, et al., The Social Phenotype of Williams

Syndrome, Curr. Opin. Neurobiol. 23(3):417; Exhibit 4, Godbee & Porter, Comprehension

of sarcasm, metaphor and simile in Williams syndrome, Int. Lang. Comm. Disord.,

48(6):652 (Nov-Dec 2013). "As a consequence of this chromosomal deletion disorder, [Alex]

does not have the normal appreciation for subtle interpersonal interactions, awareness of

danger, or normal feelings of interpersonal warning.  It places him at considerable risk due

to his 'cocktail personality' (high level of approachability and need for affiliation with

others) for easy manipulation because of his social naïveté and desire for social affiliation."

Exhibit 1, Dr. Peterson's Report, p. 15.

Those with the opportunity to observe Alex over time, even if unfamiliar with

Williams syndrome, have observed its characteristic social phenotype.

His aunt and uncle noted that "[f]rom the time Alex was young it also was obvious

that he is a bit different. Despite his warmth and social nature, he has demonstrated a social

and physical awkwardness, including a slight speech defect. We heard stories of challenges he faced in school and with keeping up with his peers. We watched him struggle with how to transition to adulthood with confidence." Exhibit 5, Letters of Support, letter from Eric & Donna Davies. When the Davies came across a story on Williams syndrome in *The Columbus Dispatch*, they felt like it was explaining the very traits and behavior they had observed watching Alex. *Id.*

Rena Kilgore, Alex's elementary school teacher, remembers: "He was friendly to everybody, making no distinction between whether another student was popular or not, nice in return or not, or interested in talking to him or not."  Exhibit 5, Letters of Support, letter from Rena Kilgore. She recalled that Alex as a "teacher pleaser" in his childhood and has observed him to have maintained the same attitude into his adulthood, noting that he would do anything to please an employer. *Id.*

Alex's former elementary school principal, Pat Happer, recalls observing the social struggles Alex faced throughout his childhood. Although Alex "seemed to easily relate to adults[,] especially those that reacted to him in a friendly manner," he was "typically awkward at times when communicating with his peers." Exhibit 5, Letters of Support, letter from Pat Happer. Regarding the way that Alex's peers received him, Mr. Happer also noted, "He was always expected to make appropriate decisions and was held accountable on those occasions when he didn't." *Id.*

While his family, family friends, and educators held him in high esteem, Alex still lacked for peer bonding. Alex's social life has been in keeping with what is often expected for individuals with Williams syndrome. Although there are many in his life who care for him, *see* Exhibit 5, Letters of Support, Alex cannot really boast any personal friends. He is used to people avoiding him. Exhibit 1, Dr. Peterson's Report, p. 11; *see also id.* at p. 18 ("Throughout his life, he has felt socially isolated, in need of social contact (highly empathic), and seeks high levels of interpersonal affiliation despite multiple episodes of being rebuffed.  Until fairly recently, he was less aware of his social awkwardness, but aware of being shunned by others, and fully aware of never really fitting in.").

Although Alex was experienced at being lonely, he never became comfortable with it; as a result of his Williams syndrome, the yearning for social connection endured. Searching for a place to be part of something, Alex has been drawn to houses of religion. Exhibit 1, Dr. Peterson's Report, pp. 12, 14. Part of what interested Alex in Islam is that he did not feel like he was fully a part of the Christian congregations he had joined previously. Exhibit 1, Dr. Peterson's Report, p. 13.

In January 2015, just three months before he was arrested and charged in this case, Alex began attending the Islamic Center of Topeka. Alex was not seeking an accomplice or co-conspirator, for he had no criminal plans or motivations. Alex was simply looking to feel connected on an interpersonal level. It was then that Booker approached and

6

befriended Alex. Booker's willingness to associate with Alex was a rare and welcome opportunity for Alex, who was especially lonely and particularly receptive to Booker's interest in talking and being friends.

Alex did not care for every aspect of Booker. Even excluding Booker's criminal interests, there was plenty to not like about him. Booker was bossy and self-absorbed, he constantly spoke of himself and his own interests, and he lectured Alex about what he believed was proper in Islam. Alex's father observed that Booker did all the talking in his relationship with Alex and tried to control Alex in social situations; he hoped Alex would tire of it and move on from Booker in time. Exhibit 5, Letters of Support, letter from Tom Blair. But Alex was enchanted to have found someone who wanted to socialize with him—even someone who barely let him get a word in and who constantly used him for rides (Booker did not drive, but Alex had access to his parents' car).

And Alex was compelled to try to maintain that relationship by biologically-mediated psychiatric impulses completely out of his control. Although he did not want to personally participate in Booker's jihad, it made Alex feel included and important when Booker made him privy to the "confidential" information. These were feelings that Alex, as a result of his Williams syndrome, had yearned for all his life but had been unable to attain until that time. The significant influence of Alex's unique mental profile in his interactions with Booker cannot be understated.

As described by forensic psychiatrist Stephen E. Peterson, M.D., "[Alex] has great difficulty keeping friends, so has a bit of a 'puppy syndrome.'  That is, he easily latches onto those who show him positive feedback, without much of a warning system whether such trust is warranted.  He was likely to not understand his own social vulnerability to be manipulated by others." Exhibit 1, Dr. Peterson's report, p. 16. In addition, his biological composition prevents him from registering fear and threat in a normal way. Exhibit 1, Dr. Peterson's Report, p. 21.

In sum, Alex was both "biologically predisposed not to perceive the seriousness of Mr. Booker's threat" and "more likely to be manipulated by Mr. Booker than the average person." Exhibit 1, Dr. Peterson's Report, p. 22. And, in addition to acting under considerable biologically-mediated social naivete, Alex's reasoning processes were impaired as compared to his peers. *See* Exhibit 1, Dr. Peterson's Report, pp. 12, 15. Dr. Peterson ultimately concluded that Alex "participated in the actions with Mr. Booker without normal adult mental capacity." Exhibit 1, Dr. Peterson's Report, p. 22.

Thus, while Alex may be guilty of violating the law, his blameworthiness is substantially mitigated by his unique psychiatric circumstances. As inchoate offenses like conspiracy rely heavily on the offender's mindset, the impact of Alex's Williams syndrome on his participation in the offense is particularly significant. The punishment calculated under the Sentencing Guidelines likely attributes substantially more malice to the typical

offender than was actually present in this case. As Alex is far from typical, the Guidelines

sentence must be viewed with particular caution in this case.

**II.     The need for the sentence imposed (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; (C) to protect the public from further crimes of the defendant; and (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.**

**A.     A non-prison sentence adequately reflects the seriousness of Alex's offense and provides adequate deterrence to any future criminal conduct.**

As developed in more detail above and below, Alex was not predisposed to this

crime and presents a very low risk for reoffense. Monitoring Alex through a non-prison

sentence will provide just punishment while simultaneously deterring future criminal

conduct. Dr. Peterson noted that Alex's "compliant personality features" would make him

particularly well suited to cooperating with Probation's supervision requirements and that

Alex's "very motivated, well-informed, family" could assist with supervision. Exhibit 1,

Dr. Peterson's Report, p. 22. Defense counsel submits that this has been the case during

Alex's successful time on pre-trial supervision.

**B.     As Alex's criminality was a product of singular circumstance rather than criminal predilection, the public does not need protection from him.**

Alex did not become involved in his offense due to criminal inclination, but under

peculiar circumstances that are highly unlikely to be repeated. "His problem solving

9

ideation was somewhat rigid, due to his developmental difficulties, suggesting he would

not be an independent mover in any kind of 'terrorist plot.'" Exhibit 1, Dr. Peterson's

Report, p. 16. And, although Alex was naive at the time of his relationship with Booker, he

is not incapable of learning. Coming before a federal court on criminal charges has had an

extraordinary impact on him. *See, e.g.,* Exhibit 6, Alex Blair's letter to the Court; Exhibit 1,

Dr. Peterson's Report, frequently noting how this case has overwhelmed Alex.

Dr. Peterson assessed other risk factors to be particularly low with Alex. "No alcohol

dependency, drug dependency, schizophrenic spectrum disorder, cyclical mood disorder,

antisocial personality, antisocial adult behavior, or violence-oriented mindset is evident in

Alex Blair's functioning." Exhibit 1, Dr. Peterson's Report, p. 22. And "Mr. Blair did not

demonstrate any overriding violent tendencies, grudge holding, prior legal difficulties,

exploitative mindset, antigovernment stance, militaristic focus, or committed extremist

state of mind that might make him an ongoing danger." Exhibit 1, Dr. Peterson's Report,

p. 22.

> **C. The most effective form of correctional treatment would be provided through a non-prison sentence.**

Considering Alex's unique circumstances, it is possible that incarceration would

have a transformative effect on him in precisely the opposite way that the Court would

desire. Dr. Peterson's report explains:

> Incarceration would be very detrimental due to Alex Blair's biologically-mediated lack of threat awareness.  Even though he is loquacious and can interact with verbal abilities that are at the near normal IQ level, his chromosome-deletion mediated language processing impairments are permanent.  In prison, his Williams syndrome mediated behavior will readily prevent his perception of threats from others.  He is biologically 'hardwired' to misinterpret threats as positive interactions.  He may uncritically affiliate with those he perceives as friendly to him.  He may even yearn for contact enough to align with anyone.  That puts him at extreme risk for sexual, physical, and interpersonal exploitation in prison. **Such exploitation would further damage his gullibility, and may prevent him from letting go of a penitentiary mindset when released. Even more ominously, out of an instinct for physical survival, he may mold his behaviors toward violence and then be unable to let that go once released from custody.**  From a psychiatric perspective, putting him in a penitentiary could very much result in his experiencing physical, sexual, and emotional traumas.  These would leave him further damaged (through persistent post traumatic reliving or flashbacks, potentially physical injuries, and permanently altered trauma pathways in the brain) and still inherently without a biological ability to deal with complex traumatic life events.

Exhibit 1, Dr. Peterson's Report, p. 23 (emphasis added). While Alex committed a crime,

he has never been a primary danger to society. Given his unique situation, it is possible that

a prison sentence could change that.

## III.    The kinds of sentences available.

There is no minimum sentence for Alex's crime. The maximum sentence that may

be imposed is five years' imprisonment.

## IV.    The sentencing range established by the Guidelines.

Alex's presentence investigation report reflects his total offense level as 33 and her

criminal history category as I, yielding a guideline range of 235 to 293 months'

imprisonment. Because the statutorily authorized maximum sentence of five years is less

than the minimum of the applicable guideline range, the guideline term of imprisonment

is 60 months' imprisonment.

**V.      Any pertinent policy statement issued by the Sentencing Commission.**

The defense is unaware of any pertinent policy statement issued by the Sentencing

Commission.

**VI.     The need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct.**

The defense is unaware of any similar defendants who have been found guilty of

similar conduct. Rather, Alex is possibly the most unique defendant and his case is one of

the most peculiar matters defense counsel has ever encountered.

While it may seem appropriate to compare Alex to his co-conspirator, Booker,

aligning the two defendants should be resisted in light of their substantial personal

differences and the significant distinctions between the paths toward their convictions. As

Dr. Peterson noted, the men were operating at completely different levels of initiative and

culpability:

> From a psychiatric perspective, Mr. Blair's participation with Mr. Booker would always have been at a subordinate level.  Mr. Blair's Williams syndrome predisposed him to feel empathically aligned with Mr. Booker to try to help him, as he felt aligned with most others even those who shunned him.  Mr. Blair's life pattern demonstrated such a pattern.  In addition, research relating to impaired language development, impaired oromotor praxis (developmental mimicking of normal facial expression

12

understanding), and impaired brain activation clearly demonstrate that Mr. Blair was biologically (mental defect) predisposed to be unable to perceive the danger of, process alternative interventions for, and to contravene Mr. Booker's actions.

Exhibit 1, Dr. Peterson's Report, p. 22.

## CONCLUSION

In many cases, the applicable Guidelines range can provide an appropriate sentence, or very close to it, because the Sentencing Guidelines are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions." *Gall v. United States*, 552 U.S. 38, 40 (2007). But, every so often, there is a case that turns that premise on its head—a case like this one. Because the facts of this case and Alex's history and nature are so unique, an empirical approach that draws from a pool of vastly different defendants and circumstances is entirely unhelpful.

Instead of looking to the guidelines, the Court must select a sentence within the statutory range— allowing anything from probation to five years in prison. The ultimate issue for the Court is whether protecting society means imprisoning Alex. And, if so, for how long? What is the right thing to do with Alex, for him and for society?

"[F]our considerations--retribution, deterrence, incapacitation, and rehabilitation--are the four purposes of sentencing generally, and a court must fashion a sentence 'to achieve the[se] purposes . . . to the extent that they are applicable' in a given

case." *Tapia v. United States*, 564 U.S. 319, 325 (2011).  None of the four sentencing considerations support a sentence of imprisonment in this case.

Retribution: Discussion of retribution as a sentencing objective is found almost exclusively with respect to violent crimes and commonly in death penalty litigation. Retribution does not mesh well with an inchoate offense.  That is particularly true in this case, where Alex loaned $100 to Mr. Booker, who mistakenly believed he was acting at the behest of terrorists (when, in fact, his contacts were government agents, and no terrorist act would ever come to fruition).

Deterrence: It is nonsense to suggest that sending Alex to prison might deter terrorist acts by radical individuals willing to die for their cause. And deterring future misconduct by Alex certainly does not require a prison sentence. Rather, imprisoning Alex could have the opposite effect.

Incapacitation and rehabilitation: Alex is young.  There is no need for nor value in short-term incapacitation. Instead, the true value in sentencing Alex is the opportunity to establish a lengthy period for monitoring him in the community—establishing a pattern and foundation for the balance of his life.

Thoughtful consideration of sentencing objectives and the particular defendant before the Court indicate that a non-custodial sentence will provide appropriate

14

punishment that suits the best interest of society. For the foregoing reasons, the defense

urges the Court to impose a non-prison sentence.

Respectfully submitted,

JOSEPH, HOLLANDER & CRAFT LLC
*Attorneys for Defendant Alexander Blair*

By:     s/ Christopher M. Joseph
        Christopher Joseph, KS-19778
        1508 S.W. Topeka Blvd.
        Topeka, KS 66612
        Ph:  785-234-3272
        Fax: 785-234-3610
        cjoseph@josephhollander.com

## CERTIFICATE OF SERVICE

I hereby certify that on August 12, 2016, I electronically filed the foregoing with the clerk of the court by using the CM/ECF system which will send notice of electronic filing to all parties of record.

s/ Christopher M. Joseph
Christopher M. Joseph