# UNITED STATES DISTRICT COURT
## ——— District of Kansas ———

**UNITED STATES OF AMERICA,**
                    **Plaintiff,**


          **v.**                                    Case No.    **15-40031-01-DDC**

**ALEXANDER E. BLAIR,**
                    **Defendant.**

### GOVERNMENT'S RESPONSE TO DEFENDANT'S SENTENCING MEMORANDUM
### (Doc. 46)

The United States of America, by and through Anthony W. Mattivi, Assistant United States Attorney for the District of Kansas, hereby responds to the defendant's Sentencing Memorandum (Doc. 46).   The defendant's objections to the Presentence Investigation Report ("PSR") are without merit, and the Court should sentence him consistently with the recommendations in the PSR.

### I.      Introduction

The defendant correctly points out the law related to sentencing.   He is correct that the Court must consider the United States Sentencing Guidelines, along with other sentencing goals, when sentencing a defendant.   *United States v. Booker*, 543 U.S. 220, 259 (2005).   He is also correct that the appellate test for review of a sentence is "reasonableness."   *Gall v. United States*, 552 U.S. 38, 49 (2007).

The disputed issues in this sentencing are narrow.   The government does not dispute the fact that the defendant suffers from a learning disability called Williams Syndrome, or how Williams Syndrome manifests, or even that the defendant shows classic signs of Williams Syndrome.   Rather, the only issue here is what sentence is appropriate, in light of the unique facts of this case, and especially in light of the already favorable plea agreement afforded this defendant.   But first the government points out a number of facts the defendant fails to mention in his sentencing memorandum.

## II.   Facts

The defendant has admitted – not only in his guilty plea, but also in his sentencing memorandum – that he knowingly and intentionally assisted John T. Booker, Jr., in Booker's plan to detonate a vehicle-borne improvised explosive device ("VBIED") at Fort Riley, Kansas, in order to kill and maim as many United States service members as possible.   To excuse his conduct, the defendant offers everything from expert testimony and scientific evidence to the opinions of friends and family members.   But his excuses do not negate the chilling admissions made in his post-arrest interview with FBI agents.

Early in this interview, the defendant admitted that he gave Booker $100 for the purpose of renting a storage unit, that he knew he was incriminating himself by admitting this, and that he knew Booker was renting the unit because Booker intended to commit a suicide bombing.   PSR at ¶¶ 34 – 42.   The defendant said he did not like Booker's plan, but he helped nevertheless.   *Id*. at ¶ 40.   He also admitted to knowing the specifics of Booker's plan:    the unit was going to be used to store "a vehicle that they could make the device," *id*. at ¶¶ 149 – 150, and that the plan could involve killing

2

civilians.   *Id*. at ¶ 177.   He admittedly knew the specifics of what Booker intended, even before he loaned the money to Booker.   *Id*. at ¶¶ 173 – 74.

The defendant went on to admit that he believed Booker was part of a nationwide series of attacks, and that the "scariest part" was that Booker intended to use a thousand pounds of ammonium nitrate in the explosive device.   The defendant told the agents, "I don't know if you're shitting yourself [thinking about that], but I know I am . . ."   *Id*. at ¶¶ 50 – 67.

During a discussion of the defendant's thoughts when he learned the details of Booker's plan and how powerful the device was intended to be, and whether the defendant considered calling the authorities, *id*. at ¶¶ 93 – 115, the defendant stated, "No, I did not think about calling."   *Id*. at ¶ 108.   Though he stated that while in some ways he was happy Booker's plan did not work, he also stated the contrary position:   "yeah, I was kinda hopin' he would succeed . . ."   *Id*. at ¶ 111.   He said that if law enforcement discovered Booker's plan, the plan would get shut down, and "that would be a bad thing[.]"   *Id*. at ¶¶ 211 – 214.

The defendant argues that, as a result of the effects of Williams Syndrome, he is "more likely to be manipulated by Mr. Booker than the average person."   Doc. 46 at 8. But the defendant admitted that at one point Booker asked the defendant to "get him a gun," and he responded that he "[didn't] feel comfortable doing that…"   PSR at ¶¶ 236 – 238.   This shows the defendant was capable of distinguishing right from wrong and of rejecting Booker's directives when he thought it appropriate.

3

Finally, the interviewing agents asked the defendant about the fact that Booker's plan would involve killing not only soldiers, but also women and children. The agents asked the defendant how it would weigh on him that he hadn't called to report Booker. The defendant responded that, in the course of the war on terror, our soldiers "bomb towns and stuff like that (sic) kill women and children too." He said he'd have been "pissed" at Booker if Booker had attacked a civilian population (citing as an example Aggieville, the college area of Manhattan, Kansas), but he differentiated civilians from the military by saying, "that's what [the soldiers] signed up for." *Id*. at ¶¶ 388 – 393.

### III.   The Plea Agreement

During the course of this investigation, the government came to view the defendant as a moderating influence on Booker, who was mercurial and unpredictable, prone to spontaneous conduct that caused the agents concern about the imminent danger Booker posed. However, the agents saw that that Booker was less likely to pose an unpredictable threat when he was in the defendant's company. Although the agents were not aware that the defendant suffered from a diagnosed learning disability, they recognized the defendant's social awkwardness and what appeared to be intellectual limitations. When these agents interviewed the defendant after Booker's arrest, their intent wasn't to trap him or to coax him into incriminating admissions; rather, they expected (and even hoped) to clear him and instead focus their efforts on prosecuting Mr. Booker. The agents were stunned by the defendant's unexpected admissions that he knew the purpose of the storage unit and supported Booker's plan.

Because the government recognized the limited nature of the defendant's participation in Booker's plot, along with his social and intellectual limitations, the government ultimately decided to charge the defendant with a violation of 18 U.S.C. § 371, an offense statutorily capped at five years' imprisonment.   The defendant's charged offense is consistent with the nature and seriousness of his conduct, it will result in a sustainable conviction, and it is informed by an individualized assessment of the specific facts and circumstances surrounding the offense.   But the defendant has admitted to facts that support a charge of material support to a terrorist, in violation of 18 U.S.C. § 2339A, with a possible sentence of 15-years.   Were it not for the government's consideration of the defendant's limited role in the offense and his social and intellectual issues, the defendant could have faced this material support charge instead of the conspiracy charge under 18 U.S.C. § 371.   The government respectfully submits this charging decision – which already accounts for most, if not all, of the very arguments made by defendant – should weigh heavily on the Court's determination of an appropriate sentence for this unique defendant under these unusual circumstances.

## IV.    The Appropriate Sentence

The defendant has admitted to knowingly and intentionally assisting John Booker in Booker's efforts to detonate a VBIED at Fort Riley, Kansas, intending to maim and kill as many soldiers and other service members as possible.   Although the defendant's involvement was limited, his crime is nevertheless a very significant one deserving of substantial punishment.

The defendant's PSR applies a base offense level of 24, along with a terrorism enhancement that results in the application of a 12-level increase to the offense level. The PSR calculates the total offense level as 33.   The defendant's criminal history is VI, not due to the defendant having committed any prior offenses (he has not), but because of the nature of his conduct in this case.   As a result, the United States Sentencing Guidelines recommend a sentence of imprisonment of between 235 and 293 months.

At the time the government filed the Superseding Indictment charging the defendant with conspiracy, the government anticipated both the base offense level and the terrorism enhancement.   As pointed out above, the defendant has admitted to facts that support a charge of material support to a terrorist, in violation of 18 U.S.C. § 2339A. In other words, the defendant has admitted to committing an offense that is capped at 15 years imprisonment, but for which the guidelines recommend a sentence closer to 20 years imprisonment.

Recognizing and appreciating the defendant's limited involvement and learning disability, the government filed a charging document that caps the defendant's sentencing exposure at 60 months.   The government respectfully submits this charge – and the resulting sentence – adequately addresses the defendant's limited role in the offense, as well as any of his social and intellection limitations.

In spite of the defendant's unique situation and characteristics, the fact that he knowingly and voluntarily assisted Booker in attempting to violently murder hundreds of soldiers warrants significant punishment.   A sentence of imprisonment for five years is justified in this case.   The government submits that anything less would be

inappropriately lenient and would not be "reasonable" under the circumstances.    *Gall,*

*supra*, 552 U.S. at 49.

>    **V.      Conclusion**

Based on the facts, the government respectfully submits that a sentence of

imprisonment for five years is appropriate, reasonable and just.    It balances the serious

nature of the offense against the defendant's limited involvement and his learning

disability, and it satisfies the requirements of the guidelines.    The defendant's arguments

in response to the PSR should be rejected, and the Court should sentence the defendant

consistent with the recommendations found therein, to a sentence of 60 months

imprisonment.

>    Respectfully submitted,
>
>    THOMAS E. BEALL
>    Acting United States Attorney
>
>    *Anthony W. Mattivi*
>    ANTHONY W. MATTIVI
>    Assistant United States Attorney
>    District of Kansas
>    290 Carlson Federal Building
>    444 SE Quincy Street
>    Topeka, KS 66683
>    Ph: 785.295.2850 (Office)
>    Fax: 785.295.2853
>    Anthony.Mattivi@usdoj.gov

**CERTIFICATE OF SERVICE**

I hereby certify that on this   22nd   day of August, 2016, I electronically filed the foregoing Response with the Clerk of the Court by using the CM/ECF system which will send an electronic copy to the following:

Christopher M. Joseph
cjoseph@josephhollander.com


*Anthony W. Mattivi*
Anthony W. Mattivi

8